**F I L E D**

UNITED STATES COURT OF APPEALS

December 15, 2006

TENTH CIRCUIT

ROBERT JOSEPH,

             Plaintiff-Appellant,

v.

RICHARD SHEPHERD and STEVE
BARTLETT,

             Defendants-Appellees.

No. 04-4212
(D.C. No. 2:00-CV-340 DAK)
(District of Utah)

ROBERT JOSEPH and RACHELLE
JOSEPH,

             Plaintiffs-Appellants,

v.

DEE DEE CORRADINI; ROSS C
ANDERSON; RUBEN B. ORTEGA;
JERRY MENDEZ; A.M. CONNOLE,
also known as Mac Connole, in their
individual capacities; SALT LAKE
CITY, a municipal corporation; GUY
YOSHIKAWA, an individual; ROY
WASDEN, an individual; WILLIAM
SHELTON, an individual; LARRY
STOTT, an individual; CHARLES
RICK DINSE, an individual; SCOTT
D. FOLSOM, an individual; JUDY
DENCKER, an individual; MARK
ZELIG, an individual MARK
SCHARMAN, an individual; MARK
ASKERLUND, an individual; JASON
SNOW, an individual; DAVID
GREER; ZANE SWIM, an individual,

             Defendants-Appellees.

No. 05-4181
(D.C. No. 2:00-CV-340 DAK)
(District of Utah)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **HOLLOWAY**, and **McCONNELL**, Circuit Judges.

This is the second time Plaintiff Robert L. Joseph has appeared before this Court to challenge district court rulings in favor of persons and entities he claims participated in an unconstitutional cabal to remove him from the Salt Lake City Police Department. In his first appeal, we affirmed the district court's grant of summary judgment to David Yocum, the Salt Lake County District Attorney, and Salt Lake County on Mr. Joseph's malicious prosecution claim. *Joseph v. Yocum*, 53 F. App'x 1, 4 (10th Cir. 2002). This appeal comprises claims under 42 U.S.C. § 1983 against other employees of the Salt Lake County District Attorney's office, Salt Lake City, and officers of the Salt Lake City Police Department. We hold that the district court properly dismissed each defendant and therefore **AFFIRM** its judgments.

## I. Facts

Late in the evening of March 26, 1999, Mr. Joseph, who was then a Salt Lake City police officer, met his wife, Rachelle, at a park to give her a house key

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

because she had been inadvertently locked out of their home. While they were conversing, a car passed them at excessive speed. Mr. Joseph left the park and pursued the car. When Mr. Joseph caught the speeding motorist, an altercation ensued. Mr. Joseph claims that the motorist opened the door and put the car in motion, thereby scooping him onto the car. Mr. Joseph fired his weapon at the suspect eleven times before the motorist drove away.

Rachelle Joseph happened upon the scene as she was driving home, before any other officers arrived but after the motorist had driven away. Mr. Joseph told her he had been involved in a shooting and asked her to leave. She obliged, but had not gone far when she saw emergency vehicles with lights on driving in her husband's direction. Fearing for his safety, Mrs. Joseph returned to the scene. Since the area was cordoned off when she arrived, Mrs. Joseph approached Officer Poulsen at the scene perimeter, told him who she was, and asked to see her husband. Officer Poulsen let Mrs. Joseph, who was upset and crying, into his car so he could take her to the scene to talk to Mr. Joseph. Subsequent events at the shooting scene led her to file a claim under 42 U.S.C. § 1983 for alleged violations of her Fourth Amendment rights. We discuss those events in greater detail below, when reviewing the district court's dismissal of her claim.

Both the Salt Lake City Police Department and the Salt Lake County District Attorney's office investigated Mr. Joseph's role in the shooting. The D.A.'s office assigned defendant Steve Bartlett to the case. As a result of the

investigations by Mr. Bartlett and others, Mr. Joseph was eventually indicted for second-degree aggravated assault. Before trial, however, the D.A.'s office dropped the charges. On January 18, 2000, defendant Richard Shepherd wrote a letter to former Salt Lake City Police Chief Arthur Connole describing the decision of the D.A.'s office to file and subsequently drop charges against Mr. Joseph.

Even though Mr. Joseph never stood trial for the shooting, he was terminated from the police force. He appealed his termination to the Salt Lake City Civil Service Commission, but failed to participate in discovery. The City eventually filed a motion to dismiss Mr. Joseph's appeal as a sanction for his refusal to cooperate. Shortly before the Commission was scheduled to rule on that motion, Mr. Joseph, through counsel, agreed to provide all the materials the City had requested within fifteen days. Mr. Joseph failed to live up to his end of the bargain, however, and the City again moved to dismiss. This time, the Commission granted its request. Mr. Joseph appealed the Commission's decision to the Utah Court of Appeals, claiming that he had been denied the due process right to challenge his termination. The Utah Court of Appeals upheld the Commission's decision, specifically rejecting Mr. Joseph's due process argument. *Joseph v. Salt Lake City Civil Serv. Comm'n*, 53 P.3d 11, 16 (Utah Ct. App. 2002). The Utah Court of Appeals' judgment became final after both the Utah Supreme Court, *Joseph v. Salt Lake City Civil Serv. Comm'n*, 63 P.3d 104 (Utah

-4-

2002), and the United States Supreme Court, *Joseph v. Salt Lake City Civil Serv. Comm'n*, 540 U.S. 821 (2003), denied certiorari.

Mr. Joseph then filed this § 1983 case in the district court. The district court dismissed all claims against Mr. Yocum and Salt Lake County, and this Court affirmed. *Joseph*, 53 F. App'x at 4. Mr. Joseph then amended his complaint to allege malicious prosecution claims against Mr. Shepherd and Mr. Bartlett. He also alleged that Salt Lake City denied him due process during the Civil Service Commission hearings.

## II. Procedural History and Standard of Review

Case number 04-4212 is Mr. Joseph's appeal from the grant of a Rule 12(b)(6) motion to dismiss the malicious prosecution claims against Mr. Shepherd and Mr. Bartlett. We review *de novo* the district court's grant of a Rule 12(b)(6) motion to dismiss, "applying the same standards as the district court." *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006). We accept all well-pleaded factual allegations in the complaint as true and view them "in the light most favorable to the nonmoving party." *Id.* (internal quotation marks omitted). But merely conclusory allegations in a complaint do not constitute well-pleaded factual allegations. *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006).

Case number 05-4181 is the Josephs' appeal of the district court's grant of summary judgment in favor of Salt Lake City and Officers Mendez and Zelig on their due process and Fourth Amendment claims. "We review the grant of

summary judgment de novo and affirm only if the record, considered in the light most favorable to the [nonmoving party], establishes no genuine issue of material fact, and the defendant is entitled to a judgment as a matter of law." *Westland Holdings, Inc. v. Lay*, 462 F.3d 1228, 1229 (10th Cir. 2006) (internal quotation marks and citations omitted).

## III.   The Malicious Prosecution Claims

### A.   Richard Shepherd

In January 2000, Richard Shepherd was the director of the Criminal Division in the Salt Lake County District Attorney's office. On January 18, 2000, he wrote a letter to then-Police Chief Arthur Connole describing his office's decision to file and then dismiss criminal charges against Mr. Joseph for Joseph's role in the March 26, 1999, shooting. The letter contained Mr. Shepherd's opinion of the legality of Mr. Joseph's conduct, concluding with this statement: "Unfortunately there are factual disputes that exist and there is no other forum available to resolve these issues. The only conclusion I can assert with some finality is that the decision was made not to proceed further with criminal prosecution." Appellees' Br., Ex. H, at 2. Mr. Joseph's claims against Mr. Shepherd relate solely to Shepherd's authorship of that letter. Appellant's Br. 8.

Since this letter followed the dismissal of criminal charges against Mr. Joseph, it cannot form the basis for a § 1983 malicious prosecution claim. *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1244 (10th Cir. 2003). The only

-6-

possible due process claim it may raise is an infringement upon Mr. Joseph's

"'liberty interest in [his] good name and reputation as it affects [his] property

interest in continued employment.'" *Stidham v. Peace Officer Standards &*

*Training*, 265 F.3d 1144, 1153 (10th Cir. 2001) (quoting *Workman v. Jordan*, 32

F.3d 475, 480 (10th Cir. 1994)). The district court held that Mr. Joseph failed to

state a claim. We agree.

To establish this type of liberty deprivation, a plaintiff must allege and

prove each of these four elements: "'First, . . . the statements must impugn the

good name, reputation, honor, or integrity of the employee. Second, the

statements must be false. Third, the statements must occur in the course of

terminating the employee or must foreclose other employment opportunities. And

fourth, the statements must be published.'" *Id.* (quoting *Workman*, 32 F.3d at

481).

Mr. Joseph's brief does not cite to the paragraphs in his complaint that

allege these four elements. The complaint is particularly deficient in two

respects. First, although the complaint contains the conclusory allegation that the

letter was "falsified," it does not identify any specific statements of purported

facts that it alleges both to be false and to impugn his reputation. Mr. Shepherd's

letter states that "[t]he only conclusion I can assert with some finality is that the

decision was made not to proceed further with criminal prosecution." Appellees'

Br., Ex. H, at 2. That statement—the only factual conclusion asserted with "some

finality"—is undoubtedly true, and it does not impugn his reputation. Mr. Joseph does not contend otherwise. The letter also states that "[u]nfortunately there are factual disputes that exist," but again, Mr. Joseph does not contend this is false (indeed, his account of the events in question seems to corroborate rather than contradict the presence of factual disputes). Nor does this statement impugn Mr. Joseph's reputation. In his brief, Mr. Joseph seems to argue that the problem with the letter is that it insinuated the reason for dismissing the case was lack of, or uncertainty about, the evidence, rather than that Mr. Joseph was exonerated. But Mr. Joseph's obligation as a plaintiff is to identify a statement in the letter that is false and that impugns his good name. Failure to exonerate him is not the same as impugning his good name, reputation, honor, or integrity.

Second, the complaint contains no allegation that Mr. Shepherd "published" the letter. Internal communications, if not made public, can have no effect on an employee's good name or reputation, and there is no allegation in the complaint that the defendants made the letter public. *See Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1235 (10th Cir. 1998) ("Also fatal to plaintiff's liberty interest claim is the fact that the defendants made no public statements disparaging [the plaintiff] or harming his standing or associations in the community. The Supreme Court has rejected the theory that the mere fact of dismissal, absent some publicizing of the reasons for the action, could amount to a stigma infringing one's liberty." (internal quotation marks and emphasis omitted)); *Dickeson v.*

*Quarberg*, 844 F.2d 1435, 1440 (10th Cir. 1988) ("A liberty interest is not violated when one is discharged without public disclosure of the reasons for the discharge."). Accordingly, we affirm the district court's judgment dismissing this cause of action for failure to state a claim.

**B. Steve Bartlett**

Steve Bartlett was the district attorney's office investigator assigned to Mr. Joseph's shooting incident. Mr. Joseph alleges in his § 1983 malicious prosecution claim that Mr. Bartlett "conducted [a] deliberate investigation against him" by allegedly failing to "follow[] the protocol, . . . to implore [sic] his own judgment . . . , and deliberately whether knowingly or recklessly, withheld the State Crime Lab information from prosecutors at the time of screening." Appellant's Br. 6. The district court held that Mr. Bartlett was entitled to prosecutorial immunity and qualified immunity. It also held that Mr. Joseph's claims against Mr. Bartlett were barred by claim and issue preclusion.

We affirm the district court's judgment granting absolute immunity to Mr. Bartlett for his role "in presenting criminal charges to the D.A. by personally preparing an information against Officer Joseph [and by] obtain[ing] an arrest warrant." Appellant's App. 60. Though Mr. Bartlett is not the prosecutor, prosecutorial immunity extends to certain agents of the prosecutor when they are engaged in performing tasks that are inherently prosecutorial in nature. As we explained in *Perez v. Ellington*, 421 F.3d 1128 (10th Cir. 2005), when

-9-

determining whether a defendant is entitled to absolute immunity, we employ a functional approach that examines "'the nature of the function [the defendant] performed, not the identity of the actor who performed it.'" *Id.* at 1133 (quoting *Malik v. Arapahoe County Dep't of Soc. Servs.*, 191 F.3d 1306, 1314 (10th Cir. 1999)). An investigator who prepares a criminal complaint and seeks an arrest warrant is therefore entitled to absolute immunity. *Roberts v. Kling*, 144 F.3d 710, 711 (10th Cir. 1998). With regard to the district court's holding that Mr. Bartlett enjoys absolute prosecutorial immunity for his role in these two actions, this case is controlled by *Roberts*, and we affirm.

We also agree that qualified immunity shields Mr. Bartlett from liability with regard to the other allegations in Mr. Joseph's complaint. "In order to defeat a qualified immunity defense, 'a plaintiff must show that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred.'" *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1142 (10th Cir. 2006) (quoting *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 841 (10th Cir. 2005)).

Mr. Joseph fails at step one. We recently reiterated that in constitutional tort cases, "the common law tort serves as an important guidepost for defining the constitutional cause of action," but "the ultimate question is always whether the plaintiff has alleged a constitutional violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1289 (10th Cir. 2004) (citing *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th

Cir. 1996)). Most of Mr. Joseph's factual allegations simply do not state a Fourth Amendment violation. It is not unconstitutional for a district attorney's office employee to investigate a crime as his superiors direct, nor is it unconstitutional for an investigator to rely upon a fellow officer's investigation when determining whether probable cause for an arrest exists. *See United States v. Troutman*, 458 F.2d 217, 220 (10th Cir. 1972). While withholding exculpatory evidence that would vitiate probable cause for an arrest can amount to a Fourth Amendment violation, *see Pierce*, 359 F.3d at 1292, Mr. Joseph does not allege that this occurred here.

In *Grubbs v. Bailes*, 445 F.3d 1275, 1278 (10th Cir. 2006), this Court said that "[t]he constitutional inquiry" for a claim such as Mr. Joseph's "focuses on the materiality of the misconduct in relation to the determination of probable cause." *Id.* The Court continued:

> Where information has been omitted from an affidavit, we determine the existence of probable cause by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.
> If hypothetically correcting the misrepresentation or omission would not alter the determination of probable cause, the misconduct was not of constitutional significance and is not actionable under § 1983; but if this hypothesizing would alter the probable-cause determination, the misconduct undermined Fourth Amendment guarantees and may support redress under § 1983.

*Id.* (internal quotation marks and citations omitted).

Mr. Joseph's brief does not direct us to specific averments in his complaint that describe what facts Mr. Bartlett allegedly neglected to tell prosecutors. Out of an abundance of caution, we examined the complaint ourselves and reviewed such allegations. The seven or so we found do not on their face vitiate probable cause for Mr. Joseph's arrest, nor does he explain in his brief how they might do so. Accordingly, Mr. Joseph's allegations do not state a Fourth Amendment violation, and the district court properly held that Mr. Bartlett was entitled to qualified immunity.

## IV. The Due Process and Fourth Amendment Claims

Case number 05-4181 involves appeals by Robert Joseph and his wife, Rachelle Joseph, from the district court's judgment in favor of Salt Lake City Corporation, Lieutenant Zelig, and Sergeant Mendez. The Josephs' opening brief lists eight issues for appeal but contains argument sections corresponding only to three of them.[1] We will address only those three issues they briefed, for "[o]n appeal, . . . parties must do more than offer vague and unexplained complaints of error. Perfunctory complaints that fail to frame and develop an issue are not sufficient to invoke appellate review." *Femedeer v. Haun*, 227 F.3d 1244, 1255 (10th Cir. 2000) (internal quotation marks and brackets omitted).

---

[1]In addition to the two issues discussed below, Mr. Joseph challenges the district court's dismissal of his complaint against Salt Lake City as a sanction for scandalous litigation practices. *See* Appellant's Br. 37–44. Because we affirm the dismissal on the merits, we need not address this alternative holding.

### A. Salt Lake City

First, Mr. Joseph argues that Salt Lake City "deprived Joseph a [sic] due process in the manner it had prosecuted [him] during the course of the Salt Lake City Civil Service Proceedings." Appellant's Br. 26–27. The problem with this claim, however, is that the Utah Court of Appeals has already held "that the Commission did not violate Joseph's due process right to a post-deprivation hearing." *Joseph v. Salt Lake City Civil Serv. Comm'n*, 53 P.3d at 16. The Utah Court of Appeals' holding stemmed from Joseph's multiple failures, though he was represented by counsel, to comply with the City's discovery requests. *See id.* at 14, 16. Because this claim already has been litigated to finality between these same parties, the doctrine of claim preclusion bars this cause of action. *Wilkes v. Wyo. Dep't of Employment Div. of Labor Standards*, 314 F.3d 501, 504 (10th Cir. 2002).

### B. Rachelle Joseph

Rachelle Joseph sued Lieutenant Mark Zelig and Sergeant Jerry Mendez under § 1983 for allegedly violating her Fourth Amendment rights after she voluntarily returned to the shooting scene. She alleges that she was detained in a locked police car for several hours, even after she had given a statement to a police officer and had expressed a desire to go home. She contends that this encounter constituted a seizure for purposes of the Fourth Amendment and that the length of the detention—four hours—was unreasonable. Appellant's Br. 47.

The district court granted summary judgment for the defendant officers, and we affirm.

### 1. Factual Background and District Court Ruling

It is undisputed that Mrs. Joseph and her minor son were the first people on the scene after the shooting. Her husband told her that he had just been involved in a shooting and asked her to leave. She left but soon saw emergency vehicles with lights on speeding towards her husband, so she voluntarily returned to the scene. Her purpose in returning was to make sure her husband was unharmed. Appellant's App. 886, 944, 951.

She arrived around 1:00 a.m. By that time, the police had set up a perimeter around the scene. She approached Officer Poulsen, who is not a defendant, and told him who she was and that she had been with her husband just prior to the shooting. She and her son got into his car so he could take them to the scene and facilitate a visit with Mr. Joseph. *Id.* at 945, 951. They sat with Officer Poulsen in his car for half an hour to forty-five minutes. *Id.* at 887, 945, 952. After sitting with Officer Poulsen for some amount of time, "somebody came in and told [Officer Poulsen] to take" Mrs. Joseph's statement, which he did. R. Joseph Dep., Appellee's Supp. App. 92. Mrs. Joseph does not "remember exactly" what she said to him. *Id.* at 93. At about this same time—about half an hour to forty-five minutes after she arrived at the scene—Mrs. Joseph testified that Officer Poulsen told her that Officer Mendez had requested that she be taken

-14-

to the police station for questioning. Appellant's App. 887, 946, 952. Mrs.

Joseph never spoke directly with Officer Mendez; rather, she learned of Mendez's

request from Officer Poulsen and Officer Zelig. *Id.* at 887, 953. Either as part of

this conversation or somewhat later, Mrs. Joseph spoke to her husband and

learned for the first time that he was "okay." Supp. App. 100.[2]

According to her version of the events,[3] she remained in the police car until

she was told, apparently by Detective Wooldridge, a non-defendant, that she

could leave and that she would be interviewed later. App. 890. In her deposition,

Mrs. Joseph estimated that she returned home between 3:00 a.m. and 4:30 a.m.

Supp. App. 103. In her affidavit, she stated that she "got home around 5:30 a.m."

App. 888. She estimated that her home was about a 25 minute drive from the

scene of the shooting. Supp. App. 102. As is appropriate on a motion for

---

[2]Mrs. Joseph's deposition testimony differed from her affidavit with regard to the precise time of these events. In her deposition, she estimated that Officer Poulsen told her she had to go to the station between 30 and 45 minutes after her arrival, Supp. App. 97, and she talked with her husband more than an hour, and possibly more than two hours, after her arrival. *Id.* at 100. In her affidavit, which was prepared subsequent to her deposition, Mrs. Joseph stated that the request that she be taken to the station for questioning and her conversation with her husband occurred at the same time, about half an hour after she arrived at the scene of the shooting. App. 887. Neither party treats these discrepancies as material.

[3]Officer Poulsen testified by affidavit that Mrs. Joseph left the scene "shortly after she spoke with her husband and determined he was okay," that he was never asked or ordered by any officer to detain her, and that she was not detained. Poulsen Aff. at 2, App. 858. For purposes of summary judgment, the district court properly credited Mrs. Joseph's version of the events.

summary judgment, the district court gave the plaintiff the benefit of the doubt, and assumed she was in the police car for a total of four hours.

During the period between her last contact with Officer Zelig and her departure for home, Mrs. Joseph remained in the locked police car. App. 888-89. But, according to her account, she was not isolated. In addition to conversations with Officer Poulsen and her husband, "other officers came to check and see if I was alright." R. Joseph Aff. at 5, App. 888. She mentioned three officers by name: Mark Schuman, Cameron Platt, and Chad Lambourne. *Id*. She told these (or perhaps other) officers that she wanted to go home because one of her children was sick and she needed to give him medicine. *Id*. at 888–89. An officer from either the Sandy or Salt Lake City Police Departments drove to Mrs. Joseph's home to check on her children. The officer observed the children and informed Mrs. Joseph that they were sleeping and appeared all right. *Id*. at 889. During the night, several officers brought her and her son hot chocolate. One officer took her son to use a convenience store restroom, and Officer Poulsen later took her and her son to another nearby restroom. *Id*. at 889, 892. When Mrs. Joseph left the scene to go home, she thanked Officer Poulsen before she left, and hugged him. Poulsen Aff. at 3, App. 859.

The district court granted summary judgment in favor of the defendants, stating a number of alternative grounds:

Although there is a dispute as to the length of time Mrs. Joseph was at the scene of the shooting, and the court is not permitted to make factual determinations in the context of a summary judgment motion, the court nonetheless agrees with the City Defendants that no reasonable jury could conclude that the police conduct in this case would have communicated to a reasonable person that she had been detained. Moreover, even if the undisputed facts supported the fact that Mrs. Joseph reasonably perceived that she was being detained, the actions of the officers were reasonable under the circumstances. Mrs. Joseph had indicated that she was the first on the scene, and it was reasonable for the officers to seek to question her. They understandably had certain duties that they were required to attend to before they could assist Mrs. Joseph in talking with her husband. There is no indication that the detention was painful, degrading, or unduly prolonged. There is no evidence that the officers used or threatened to use any force or that they made threatening statements. There is no evidence that the officers unnecessarily detained her after they learned that she had not seen the actual incident.

In addition, there is no clearly established law regarding the length of time an officer may request that a witness stay for questioning. Thus, even assuming that Mrs. Joseph was actually detained at the scene of the shooting for over four hours, against her will, the remaining defendants would have qualified immunity for their actions. Accordingly, her claim for unlawful detention is dismissed.

App. 81–82. Mrs. Joseph now appeals from this order.

## 2. Standard of review

Because Officers Mendez and Zelig invoked the defense of qualified immunity, Mrs. Joseph must show that they violated her clearly established Fourth Amendment rights in order to hold them liable under § 1983. *Johnson ex rel. Estate of Cano*, 455 F.3d at 1142. We review *de novo* a grant of summary judgment based on qualified immunity, "and affirm only if the record reveals no genuine issue of material fact." *Arredondo v. Locklear*, 462 F.3d 1292, 1297

(10th Cir. 2006). To prove that there is a genuine issue as to a material fact—i.e., that summary judgment is improper and a trial is necessary—the nonmoving party must show that "the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)). That obligation requires the nonmoving party to "'make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Hom v. Squire*, 81 F.3d 969, 974 (10th Cir. 1996) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). It is also well established that we "may affirm a grant of summary judgment on grounds other than those relied on by the district court when the record contains an adequate and independent basis for that result." *Bones*, 366 F.3d at 875 (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 528 (10th Cir. 1994)).

### 3. Mrs. Joseph's Brief

The Appellants' opening brief consists of slightly more than two pages of argument addressing Mrs. Joseph's detention. It contains precisely five record citations, four of which are citations to the district court's order; the fifth refers to legal argument by the city attorney in district court. *See* Appellant's Br. 45–48. The brief cites one Tenth Circuit case discussing what qualifies as a seizure under

the Fourth Amendment but does not otherwise develop the remaining framework that governs suits under § 1983 for Fourth Amendment violations. The Appellants' reply brief does not even mention Mrs. Joseph's claims.

This is barely sufficient to invoke appellate review. *See Femedeer*, 227 F.3d at 1255. Mrs. Joseph does not identify the essential elements on which she would bear the burden of proof at trial, *Hom*, 81 F.3d at 973–74, nor does she cite *one piece* of evidence that would allow a reasonable jury to find in her favor on those (unmentioned) elements. *See Bones*, 366 F.3d at 875. Nor does she offer any reply to Appellees' alternative ground that the detention, if it was a detention, was reasonable. Appellees' Br. 44–48.

It is well established in this Circuit that it is not the Court's responsibility to "search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1025 (10th Cir. 1992); *see also United States v. Abdenbi*, 361 F.3d 1282, 1290 (10th Cir. 2004) ("This court should neither raise *sua sponte* an argument not advanced by a party either before the district court or on appeal, nor then advocate a particular position and resolve the appeal based on that advocacy.").

Notwithstanding the deficiencies in Appellants' brief, we will set forth our rationale for affirmance.

4.      **Analysis**

-19-

Although the district court's grant of summary judgment was based on a number of alternative grounds, Appellants focus their argument on the proposition that "the [district] Court should have determined that Plaintiff was seized for purposes of the Fourth Amendment and that the four hour detention was unreasonable." Appellants' Br. 47.

To determine whether the conduct of Officers Zelig and Mendez constituted an investigative detention, we ask whether, "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). In *United States v. Hill*, 199 F.3d 1143 (10th Cir. 1999), we identified these factors as guiding our determination of whether a person was subject to this type of seizure:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects . . . ; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

*Id*. at 1147–48. "None of these factors are dispositive, nor should they be treated as exclusive, and it may be that the strong presence of two or three factors demonstrates that a reasonable person would have believed that he was not free to terminate an encounter with government officials." *Fuerschbach v. Southwest*

-20-

*Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006) (internal quotation marks omitted).

When evaluating an investigative detention's reasonableness, we ask (1) was the detention "'justified at its inception,'" and (2) were the officer's actions "'reasonably related in scope to the circumstances which justified the interference in the first place'"? *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir. 2004) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). "At both stages, the reasonableness of the officer's suspicions is judged by an objective standard taking the totality of the circumstances and information available to the officers into account." *Id.* (internal quotation marks omitted). In addition, the Supreme Court has held that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop," *Florida v. Royer*, 460 U.S. 491, 500 (1983), and that police must "diligently pursue their investigation," *United States v. Place*, 462 U.S. 696, 709 (1983). In this connection, the Supreme Court has "impose[d] no rigid time limitation" on investigative detentions, preferring instead to let "common sense and ordinary human experience . . . govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

The most glaring deficiency in Mrs. Joseph's case is the absence of any evidence connecting the supposed constitutional violation to the defendants. As this Court recently explained:

-21-

> Section 1983 requires plaintiffs to show causation, imposing liability on a defendant who "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights . . . ." 42 U.S.C. § 1983. We have explained Section 1983's causation requirement: "[A] defendant may not be held liable under § 1983 unless he or she subjected a citizen to the deprivation, or caused a citizen to be subjected to the deprivation." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 518 (10th Cir. 1988). "A plaintiff must allege factual causation—i.e. 'but for' causation—in order to state a claim under § 1983." *Scott v. Hern*, 216 F.3d 897, 911 (10th Cir. 2000).

*Lippoldt v. Cole*, — F.3d —, 2006 WL 3200864, at *11 (10th Cir. Nov. 7, 2006).

Because Mrs. Joseph intentionally omitted Officer Poulsen as a defendant and sued only Officers Mendez and Zelig, *see* Appellee's Supp. App. 113, it is important to identify exactly what role Mendez and Zelig played in the incident.

In her memorandum in opposition to the defendants' motion for summary judgment, Mrs. Joseph expressly admitted "that Mendez's involvement" with the incident "was limited to the following":

> a. Zelig said that Mendez wanted to have her taken to the police station to be interviewed. This occurred at approximately 1:30 or 1:45 a.m., one-half hour or forty-five minutes after Rachelle first entered Officer Poulsen's police car.
>
> b. Rachelle Joseph never personally spoke to Mendez.
>
> c. Rachelle Joseph has no other knowledge of Mendez's involvement with her alleged detention.

Appellant's App. 948, 958, citing R. Joseph Dep. at 39, 40, 46. Similarly, Appellant expressly admitted "that Zelig's involvement is limited to the following":

-22-

a. Zelig told Officer Poulsen that Mendez wanted to have her taken to the police station to be interviewed.  This occurred at approximately 1:30 or 1:45 a.m., one-half hour or forty-five minutes after Rachelle first entered Officer Poulsen's police car.

b. Zelig asked or told Rachelle Joseph to wait for a homicide detective to talk to her about the events she observed or possibly told this to someone else and Rachelle Joseph overheard him.  This is probably the same event described in (a) above.

*Id.* at 948–49, 959, citing R. Joseph Dep. at 39, 40, 87-89.

By Appellants' own admission, therefore, Officers Zelig and Mendez had no direct or indirect contact with Mrs. Joseph after 1:45 a.m.  This was forty-five minutes after she voluntarily returned to the scene, no later than fifteen minutes after she gave her statement to Officer Poulsen, and about the same time she saw and spoke to her husband.  Neither defendant had any further involvement in her alleged detention.  Lieutenant Zelig's entire involvement was to convey Sergeant Mendez's desire that she be further questioned.  There is no evidence that either defendant was aware that she remained in the police car as long as she did, knew

that she had requested to go home,[4] or was otherwise aware of the conditions or circumstances.

Based on this record, we conclude that the district court properly granted summary judgment for the defendants. It is undisputed that Mrs. Joseph was at the shooting scene voluntarily for between thirty and forty-five minutes, until she talked to her husband and learned he was not seriously injured. Because this portion of the encounter was consensual, it does not implicate the Fourth Amendment. *Lopez*, 443 F.3d at 1283. At the very earliest, the incident escalated from a consensual encounter to an investigative detention after Mrs. Joseph learned that Officer Mendez wanted her to be interviewed. *See Shareef*, 100 F.3d at 1500. Assuming without deciding that at this point the encounter became an investigative detention, Mrs. Joseph must also show that the detention was unreasonable, *Fuerschbach*, 439 F.3d at 1202, by identifying evidence from which a reasonable jury could conclude that her detention was not justified at its

---

[4]In her deposition, Mrs. Joseph testified:

Q: Did you ever tell anybody, I've told you all I know. I want to go home?
A. Yes.
Q: Who did you tell that?
A: Poulsen

R. Joseph Dep., Supp. App. 99. In her affidavit, Mrs. Joseph stated that she told certain "officers" that she wanted to go home, mentioning only Cameron Platt by name. R. Joseph Aff. at 5, App. 888. This was after her last conversation with Officer Zelig.

inception and not reasonably related in scope to the circumstances justifying it, *Johnson*, 364 F.3d at 1189.

As to the first step, the undisputed evidence shows that Officers Mendez and Zelig were justified in asking Mrs. Joseph to be interviewed. They knew that Mrs. Joseph was the first on the shooting scene and thus a possible crime witness. Mrs. Joseph does not argue that this judgment was unreasonable.

Mrs. Joseph's apparent argument is that any further questioning was unnecessary because she had already told Officer Poulsen that she did not observe the shooting and did not know anything. We do not agree. There is no evidence that Officers Mendez or Zelig knew that Mrs. Joseph had given a statement to Officer Poulsen; indeed, there is no evidence that her statement to Poulsen preceded Mendez's decision to question her. Nor is there any evidence that they knew, at the time of that decision, what she said to Officer Poulsen. Moreover, when they asked Mrs. Joseph to be interviewed, Officers Mendez and Zelig knew that Mr. Joseph had been in a shooting approximately thirty to forty-five minutes earlier, Mrs. Joseph was the first on the scene following the shooting, and Mrs. Joseph was so upset that after first leaving the scene she returned, crying, to learn of her husband's welfare. In her deposition, Mrs. Joseph said she could not "remember exactly" what she said in her statement to Officer Poulsen. R. Joseph Dep., Supp. App. 93. Even assuming that Mendez knew that Mrs. Joseph had

already given a statement, it would not be unusual, or objectively unreasonable, for police to requestion a witness under such circumstances.

As to the length of the detention, based on the facts in the record, no reasonable jury could conclude that Officers Mendez and Zelig were responsible for Mrs. Joseph's presumed three-and-a-half-hour stay in Officer Poulsen's cruiser after she had talked to her husband. *Lippoldt*, — F.3d —, 2006 WL 3200864, at *11; *Scott*, 216 F.3d at 911. She admitted that she never spoke directly to Mendez, and that Mendez's only involvement was instructing Zelig to have someone interview her. Appellant's App. 948, 958. There is no evidence that Mendez or Zelig knew, or could reasonably have foreseen, that this request would entail a multi-hour detention in Officer Poulsen's car, or that either of them had any awareness of Mrs. Joseph's situation after 1:45 a.m. Indeed, Mrs. Joseph expressly admits in her response to the defendants' summary judgment motion that she has no knowledge of either defendant's involvement after this time. *See id.* at 948–49, 958–59.

So far as the record reveals, it was Officer Poulsen—not the defendants—who was responsible for placing Mrs. Joseph in the police car and who was (along with two other non-defendant officers) aware of her circumstances and the length of time of her detention. Yet she rewarded him for his efforts with thanks and a hug, not with a lawsuit.

If Officer Poulsen were a named defendant, the length of her stay in his car might well require us to reverse the grant of summary judgment. But the sum total of the evidence relating to the two named defendants is that one officer told another to ask Mrs. Joseph to be interviewed, the second officer complied with the first officer's instruction, and then both left the scene. Based on these facts, no reasonable jury could conclude that Mendez and Zelig were the but-for cause of Mrs. Joseph's prolonged stay in Poulsen's car. This absence of predicate facts establishing but-for causation means that Mrs. Joseph has not alleged a constitutional violation attributable to these defendants. Accordingly, Officers Mendez and Zelig are entitled to qualified immunity.

## VI. Conclusion

We **AFFIRM** the district court's judgment dismissing Mr. Joseph's cause of action against Mr. Shepherd for failure to state a claim, and the district court's grant of qualified immunity to Mr. Bartlett. We also **AFFIRM** the grant of summary judgment in favor of Salt Lake City because Mr. Joseph's due process cause of action is barred by the doctrine of claim preclusion. And we **AFFIRM** the district court's grant of summary judgment in favor of Lieutenant Zelig and Sargent Mendez on Mrs. Joseph's Fourth Amendment claims.

That leaves us with the pending motions in these two cases, which we resolve as follows: we **GRANT** the unopposed motion in case number 05-4181 to seal the briefs and appendices, **GRANT** the motion in 04-4212 to strike the

attachments to Mr. Joseph's motion to separate appeals, and **DENY** the motion in 05-4181 to strike the appellee's brief.

Entered for the Court,

Michael W. McConnell
Circuit Judge
